No. 23-2062

*In the*

# UNITED STATES COURT OF APPEALS

*for the*

# FIRST CIRCUIT

MEREDITH O'NEIL, JESSICA SVEDINE,
DEANNA CORBY, AND ROBERTO SILVA,

*Plaintiffs-Appellants,*

v.

CANTON POLICE DEPARTMENT, THE TOWN OF CANTON,
MASSACHUSETTS, HELENA RAFFERTY, AS CHIEF OF THE CANTON
POLICE DEPARTMENT AND IN HER PERSONAL CAPACITY, AND OFFICER
ROBERT ZEPF, OFFICER MICHAEL CHIN, OFFICER ANTHONY
PASCARELLI, AND SARGEANT JOSEPH SILVASY, IN THEIR
OFFICIAL CAPACITIES,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Massachusetts
No. 1:23-cv-12685-DJC
The Honorable Denise J. Casper

## APPELLANTS' OPENING BRIEF

MARC J. RANDAZZA
JAY M. WOLMAN
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (888) 887-1776
ecf@randazza.com

*Attorneys for Appellants*

# TABLE OF CONTENTS

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ............................1

STATEMENT OF JURISDICTION ........................................................2

STATEMENT OF ISSUES..................................................................3

STATEMENT OF THE CASE ..............................................................4

   1.0     FACTUAL BACKGROUND ........................................................4

     1.1   The Framing of Karen Read ..........................................6

     1.2   Appellees' Prosecution of Plaintiffs-Appellants ....................9

   2.0     PROCEDURAL HISTORY........................................................13

   3.0     RULING PRESENTED FOR REVIEW ..........................................13

SUMMARY OF THE ARGUMENT......................................................14

STANDARD OF REVIEW ................................................................16

ARGUMENT ...............................................................................17

   1.0     APPELLANTS HAVE A STRONG LIKELIHOOD OF SUCCESS............................17

     1.1   The Statutes Are Unconstitutional as Applied to Appellants ..................18

     1.2   The Statutes Unconstitutionally Discriminate Based Upon the Content and Viewpoint of Appellants' Speech ...........................................20

     1.3   Appellees' Actions Do Not Satisfy Strict Scrutiny .................................24

     1.4   Appellees Engaged in Unconstitutional Retaliation Based Upon Appellees' Speech............................................................28

   2.0     THE REMAINING FACTORS FAVOR INJUNCTIVE RELIEF................................30

     2.1   Appellants Will Suffer Irreparable Harm .................................30

     2.2   The Balance of Hardships Favors Appellants .........................32

     2.3   The Public Interest Favors an Injunction...............................33

CONCLUSION ............................................................................34

CERTIFICATE OF COMPLIANCE ....................................................35

CERTIFICATE OF SERVICE............................................................36

# TABLE OF AUTHORITIES

## CASES

*Ada v. Guam Soc'y of Obstetricians & Gynecologists*,
   506 U.S. 1011 (1992) ............................................................................18

*Canton Police Dept. v. Corby*,
   Docket No. 2355AC001047 (Stanton Dist. Ct.) ........................................6, 29, 31

*Canton Police Dept. v. O'Neil*,
   Docket No. 2355AC001043(Stanton Dist. Ct.) ........................................6, 29, 31

*Carey v. FEC*,
   791 F. Supp. 2d 121 (D. D.C. 2011) ....................................................33

*Cent. Me. Power Co. v. Me. Comm'n'n on Governmental Ethics*
   *& Election Pracs.*, No. 1:23-cv-00450-NT, 2024 U.S. Dist.
   LEXIS 34853 (D. Me. Feb. 29, 2024) ...................................................32, 34

*Clark v. Community for Creative Non-Violence*,
   468 U.S. 288 (1984) ...........................................................................21, 22, 23

*Cmty. House, Inc. v. City of Boise*,
   490 F.3d 1041 (9th Cir. 2007) ............................................................32

*Comm. v. Frazier*,
   99 Mass. App. Ct. 1120, 167 N.E.3d 909 (2021) .................................24

*Cornelius v. NAACP Legal Def. & Educ. Fund*,
   473 U.S. 788 (1985) ...........................................................................20

*Cox v. Louisiana*,
   379 U.S. 559 (1965) ...........................................................................26

*Cutting v. City of Portland*,
   802 F.3d 79 (1st Cir. 2015) ................................................................27

*D.B. v. Esposito*,
   675 F.3d 26 (1st Cir. 2012) ................................................................28

*Elrod v. Burns*,
   427 U.S. 347 (1976) ...........................................................................30

*Firecross Ministries v. Municipality of Ponce*,
204 F. Supp. 2d 244 (D.P.R. 2002) ....................................................32

*Gilley v. Stabin*,
Nos. 23-35097, 23-35130, 2024 U.S. App.
LEXIS 5629 (9th Cir. Mar. 8, 2024) ................................................29

*Globe Newspaper Co. v. Beacon Hill Architectural Comm'n*,
100 F.3d 175 (1st Cir. 1996) ...........................................................27

*Goldstein v. Galvin*,
719 F.3d 16 (1st Cir. 2013) .............................................................29

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ........................................................................21

*Kelly v. City of Parkersburg*,
978 F. Supp. 2d 624 (S.D. W.V. 2013) ...........................................33

*Maceira v. Pagan*,
649 F.2d 8 (1st Cir. 1981) ...............................................................30

*March v. Mills*,
867 F.3d 46 (1st Cir. 2017) .............................................................27

*McBreairty v. Sch. Bd. of RSU22*,
616 F. Supp. 3d 79 (D. Me. 2022) ..................................................33

*McGuire v. Reilly*,
386 F.3d 45 (1st Cir. 2004) ...........................................19, 22, 23

*Morse v. Frederick*,
551 U.S. 393 (2007) ........................................................................22

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977) ........................................................................29

*Mullin v. Sussex Cnty., Del.*,
861 F. Supp. 2d 411 (D. Del. 2012) ................................................33

*Najas Realty, LLC v. Seekonk Water Dist.*,
821 F.3d 134 (1st Cir. 2016) ...........................................................28

*Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*,
  969 F.3d 12 (1st Cir. 2020) ..............................................................16, 17

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
  460 U.S. 37 (1983) ................................................................................20

*Picard v. Magliano*,
  42 F.4th 89 (2d Cir. 2022) ....................................................................24

*Powell v. Alexander*,
  391 F.3d 1 (1st Cir. 2004) .....................................................................30

*R. A. V. v. St. Paul*,
  505 U. S. 377 (1992) .............................................................................22

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ........................................................................20, 22

*Ridley v. M.B.T.A.*,
  390 F.3d 65 (1st Cir. 2004) ...................................................................22

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
  515 U.S. 819 (1995) ..............................................................................22

*Ross-Simmons v. Baccarat, Inc.*,
  102 F.3d 12 (1st Cir. 1996) ...................................................................16

*Ryan v. U.S. Immigr. & Customs Enf't*,
  974 F.3d 9 (1st Cir. 2020) ...............................................................16, 18

*S.F. Real Est. Inv'rs v. Real Est. Inv. Tr. of Am.*,
  692 F.2d 814 (1st Cir. 1982) ...................................................................2

*Shuttlesworth v. Birmingham*,
  394 U.S. 147 (1969) ..............................................................................21

*Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd.*,
  502 U.S. 105 (1991) ..............................................................................22

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
  699 F.3d 1 (1st Cir. 2012) ........................................................18, 30, 34

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ..........................................................................21

*Townsend v. Basterrechea*,
  No. 1:16-cv-151-BLW, 2017 U.S. Dist.
  LEXIS 8450 (D. Idaho Jan. 18, 2017) ..........................................24

*Valley Forge Christian College v. Americans United for Separation of
  Church & State, Inc*., 454 U.S. 464 (1982) .................................29

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) .............................................................21, 23

*Weber v. Cranston School Committee*,
  212 F.3d 41 (1st Cir. 2000) ...........................................................29

**STATUTES**

28 U.S.C. § 1292 ...........................................................................2

28 U.S.C. § 1331 ...........................................................................2

42 U.S.C. § 1983 ..................................................................2, 5, 13

Mass. Gen. Laws, ch. 268, § 13A ...........................................passim

Mass. Gen. Laws, ch. 268, § 13B...........................................passim

Mass. Gen. Laws, ch. 41, § 97 ....................................................9

**OTHER AUTHORITIES**

Abby Patkin, "Karen Read's lawyers tease evidence from federal probe in motions
  for dismissal, sanctions. What we learned.," BOSTON.COM (Mar. 12, 2024).........9

Aidan Kearney, "Canton Cover-Up Part 1: Corrupt State Trooper Helps Boston
  Cop Coverup Murder of Fellow Officer, Frame Innocent Girlfriend," TB DAILY
  NEWS (Apr. 18, 2023) ..........................................................................8

Emily Sweeney, "Lead investigator in Karen Read case stands by the 'integrity of
  the work he performed,' lawyer says," THE BOSTON GLOBE (Mar. 15, 2024).......8

Matt Schooley, "Karen Read defense team says federal expert found John O'Keefe
  was not hit by SUV," CBS NEWS (Mar. 13, 2024) ..................................9

McColgan, Flint, "Trooper Connected To Karen Read Murder Case Under Internal Investigation", THE BOSTON HERALD (Mar. 14, 2024) .......................................5, 8

**RULES**

Fed. R. App. P. 28 ...............................................................................................2

Fed. R. Civ. P. 65 ...............................................................................................3

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Amend. I. .......................................................................................2, 13

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

Pursuant to L.R. 34.0(a), Appellants provide their statement as to why this Court should conduct oral argument in this appeal:

This appeal concerns significant questions going to the heart of the First Amendment, namely whether Massachusetts's witness intimidation statute is unconstitutional as applied, given that Defendants-Appellees threatened to and actually did institute criminal charges against Plaintiffs-Appellants for exercising their First Amendment rights to protest. Given the arguments Defendants-Appellees made in District Court attempting to justify their restrictions on speech, oral argument will assist the Court in deciding this appeal by allowing a more thorough explanation of the implications of Appellees' positions.

# STATEMENT OF JURISDICTION

Pursuant to Fed. R. App. P. 28(a)(4), Plaintiffs-Appellants make the following jurisdictional statement:

(A)    The District Court possessed subject-matter over the action per 28 U.S.C. § 1331, as this is a civil action on a federal question under 42 U.S.C. § 1983, and the First Amendment to the U.S. Constitution.

(B)    This Court has jurisdiction over this appeal because it relates to an interlocutory order refusing an injunction. *See* 28 U.S.C. § 1292 (a)(1). An order denying a preliminary injunction is immediately appealable. *See S.F. Real Est. Inv'rs v. Real Est. Inv. Tr. of Am.,* 692 F.2d 814, 816 (1st Cir. 1982).

(C)    The Order denying the temporary restraining order and preliminary injunction was entered November 10, 2023 (ADD001). The Notice of Appeal was filed thirty day later, on December 10, 2023 (ADD014). Thus, this appeal is timely.

Plaintiffs-Appellants assert that this Court has jurisdiction under 28 U.S.C. § 1292(a)(1), as set forth above, as this is an appeal of a denial of a preliminary injunction.

## STATEMENT OF ISSUES

1.      Whether the District Court committed reversible error when it denied Plaintiffs' Motion for Injunctive Relief under Fed. R. Civ. P. 65.

2.      Whether Mass. Gen. Laws, ch. 268, § 13A is unconstitutional as applied to Appellants.

3.      Whether Mass. Gen. Laws, ch. 268, § 13B is unconstitutional as applied to Appellants.

## STATEMENT OF THE CASE

## 1.0    FACTUAL BACKGROUND

In 1927 the Commonwealth of Massachusetts executed Nicola Sacco and Bartolomeo Vanzetti. History has shown that they were framed, and the Commonwealth has at least acknowledged that they did not get a fair trial. Nearly a century later, in the same courthouse where the Commonwealth gave itself an indelible stain of shame, there is another trial that has many hallmarks of government impropriety and corruption. Citizens have a right to call attention to that fact. Citizens have a right to protest. Citizens have a right to stand on the side of the road holding a sign that says "JUSTICE" without being harassed or prosecuted. This Court has a binary choice – it must either pronounce that the First Amendment is not in effect when the government is embarrassed, or that it is in full effect at all times.

This case is about a group of citizens who stood on a public sidewalk holding signs to protest on a matter of public concern. The government wants to do anything in its power to stop this protest, including abusing the witness intimidation law.  The government wants to stifle protest, and the lower court let them get away with it.  It isn't quite executing two innocent men for a crime they didn't commit, but the smell of corruption and ignobility lingers in that Dedham courthouse.  The Appellants respectfully ask that this Court at least open one window to let the wretched stench of injustice dissipate – even just a bit.  The First Amendment, however, demands it.

Plaintiffs-Appellants Meredith O'Neil, Jessica Svedine, Deanna Corby, and Roberto Silva[1] believe that Karen Read, a member of their local community, is being framed for the murder of her boyfriend, Boston Police Officer John O'Keefe. Verified Complaint AA003 at ¶ 1. Recent developments in the investigation strongly suggest that Read is, in fact, being framed.[2] Rather than allowing Appellants to continue their protest unhindered, because it calls attention to their corruption (or at least incompetence), Defendants-Appellees threatened to prosecute Appellants for their protests. AA007-AA009 at ¶¶ 28-40.

In response to the credible threats of arrest by Appellees, Appellants filed suit under 42 U.S.C. § 1983 and sought temporary and preliminary injunctive relief to allow their protests to continue unhindered. *See* Verified Complaint (AA001-AA020); Emergency Motion for a Temporary Restraining Order and for a Preliminary Injunction (AA035-AA036); Memorandum of Law in Support of Motion for a Temporary Restraining Order and for a Preliminary Injunction (AA037-AA051). Thereafter, and without any hearing, the District Court entered an

---

[1] As originally filed, Jenna Rocco was a plaintiff, but she voluntarily dismissed her claim and her appeal. Plaintiff-Appellant Nick Rocco is now doing the same, so this brief is not filed on his behalf.

[2] *See* McColgan, Flint, "Trooper Connected To Karen Read Murder Case Under Internal Investigation", BOSTON HERALD (Mar. 14, 2024) available at https://www.bostonherald.com/2024/03/14/trooper-connected-to-karen-read-murder-case-under-internal-investigation/ (last accessed Mar. 17, 2024).

Order denying Appellants' request. *See* Memorandum and Order (ADD001-ADD013). This appeal follows that decision.

Following the denial of injunctive relief below, Appellees made good on their threats and charged Appellants with violation of the Massachusetts witness intimidation statutes. *Canton Police Dept. v. Corby,* Docket No. 2355AC001047 (Stanton Dist. Ct.); *Canton Police Dept. v. O'Neil,* Docket No. 2355AC001043 (Stanton Dist. Ct.). These charges remain pending. *See id.*

### 1.1    The Framing of Karen Read

While the prosecution of Read is not before this Court, it is necessary to explain the underlying basis for the protest to understand who is being protested and why. The story of the murder of John O'Keefe has gripped national headlines. O'Keefe was a member of the Boston Police Department living in Canton, Massachusetts. AA004 at ¶ 10. O'Keefe and Read were dating. *Id.* at ¶ 11. On the night of Friday, January 28, 2022, O'Keefe and Read were at a Canton bar and had drinks with Chris Albert (a Town of Canton Selectman), Brian Albert (a Boston police officer and Chris Albert's brother), and Jennifer McCabe (Brian Albert's sister-in-law). AA005 at ¶ 12. When the bar was closing, Brian Albert invited O'Keefe, Read, and his relations back to his house, and O'Keefe and Read drove to Brian Albert's house. *Id.* at ¶ 13. The following morning, Read, McCabe, and O'Keefe's friend, Kerry Roberts, found O'Keefe in the snow outside Brian Albert's

house. *Id.* at ¶ 14. O'Keefe was pronounced dead later that morning. *Id.* at ¶ 15. Read was charged with manslaughter, having allegedly hit O'Keefe with her automobile. *Id.* at ¶ 16. Proctor, on June 9, 2022, arrested Read again, following a grand jury indictment against Read for second-degree murder.[3] AA006 at ¶ 20.

Subsequent to her arrest, Read's lawyer was given a tip that Brian Albert and his nephew, Colin Albert (who had an acrimonious relationship with O'Keefe), had beaten up O'Keefe that night, to the point of unconsciousness, and that Brian Albert and Brian Higgins (a special agent with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives), who had been at Brian Albert's house, dumped O'Keefe's body on Brian Albert's lawn. AA004 at ¶ 17. Additionally, State Trooper Michael Proctor, a Canton resident and lead detective into the investigation of O'Keefe's death, was apparently a friend to the Albert family—Colin Albert, for example, had been the ring bearer at Proctor's sister's wedding. AA005 at ¶ 18.

On April 12, 2023, Read's defense team filed a 92-page affidavit in her case outlining how Read had been framed. AA006 at ¶ 21. Six days later, on April 18, 2023, journalist Aidan Kearney, published his first article about the alleged framing of Read. *Id.* at ¶ 22; Aidan Kearney, "Canton Cover-Up Part 1: Corrupt State Trooper Helps Boston Cop Coverup Murder of Fellow Officer, Frame Innocent

---

[3] The prosecution is pending in the Norfolk County Superior Court, styled *Commonwealth v. Karen Read,* Docket No. 2282CR0117.

Girlfriend," TB DAILY NEWS (Apr. 18, 2023).[4] Kearney's reporting brought public support to Read, and public demonstrations in support of her followed. AA006 at ¶ 23. There is widespread public interest in the prosecution, including national print and television coverage. *Id.* at ¶ 24.

Michael Proctor, the state's lead investigator in the murder case, is the subject of an internal investigation and an investigation by federal authorities into the handling of the case. *See* Emily Sweeney, "Lead investigator in Karen Read case stands by the 'integrity of the work he performed,' lawyer says," THE BOSTON GLOBE (Mar. 15, 2024).[5] Under oath before a federal grand jury, Proctor admitted that he lied about his relationship with the Alberts to the state grand jury that indicted Read, and that he had as recently as 10 days prior to the murder asked Brian Albert's sister-in-law to babysit for his toddler child. *See id.*; *see also* McColgan, *supra* (at fn. 2). Another involved officer was found to have an undisclosed relationship with the Alberts. *See* Abby Patkin, "Karen Read's lawyers tease evidence from federal probe in motions for dismissal, sanctions. What we learned.," BOSTON.COM (Mar.

---

[4] Available at: https://tbdailynews.com/corrupt-state-trooper-helps-boston-cop-coverup-murder-of-fellow-officer-frame-innocent-girlfriend/ (last accessed Mar. 16, 2024).

[5] Available at: https://www.bostonglobe.com/2024/03/15/metro/michael-proctor-lawyer-statement-karen-read-case/ (last accessed Mar. 16, 2024).

12, 2024).[6] Meanwhile, independent federal investigators hired three experts who concluded that O'Keefe's injuries were inconsistent with the damage to Read's car, and that the damage to the car was inconsistent with contacting O'Keefe's body. *See* Matt Schooley, "Karen Read defense team says federal expert found John O'Keefe was not hit by SUV," CBS NEWS (Mar. 13, 2024).[7]

### 1.2    Appellees' Prosecution of Plaintiffs-Appellants

At an August 8, 2023, meeting of the Canton Select Board, residents voiced their concerns about Selectman Chris Albert and the Canton Police Department *vis a vis* the O'Keefe death. AA006 at ¶ 25. During that Meeting, Appellee Helena Rafferty, Chief of the Canton Police Department,[8] referred to an event:

> that made residents of our community feel disrespected, targeted, and intimidated, an event that I believe, under statute 268 13A could most possibly be deemed a criminal act. Additionally, we have an elected library trustee who, as of noon today, was still listed as a co-administrator on a social site that is allowing residents of our community to also be disrespected and dehumanized within innuendos, outright falsehoods, half-truths, and bullying comments, comments, I might add, that if it were made in a school environment, would and should have every resident in this town in an uproar. Yesterday, I received an email from a

---

[6] Available at: https://www.boston.com/news/crime/2024/03/12/livestream-karen-read-lawyers-slated-to-argue-motions-to-dismiss-case-sanction-prosecutors/ (last accessed Mar. 16, 2024).

[7] Available at: https://www.cbsnews.com/boston/news/karen-read-trial-motion-to-dismiss-hearing/ (last accessed Mar. 16, 2024).

[8] Appellee Canton Police Department ("CPD") is a police department established pursuant to Mass. Gen. Laws, ch. 41, § 97, is located in Canton, Massachusetts, and is a political subdivision of the Appellee Town of Canton, Massachusetts. AA003 at ¶ 2. To the extent CPD is not capable of being sued, the Town of Canton is named as a Defendant-Appellee, and they should be treated as a single entity.

concerned citizen related to the, and I quote, 'horrendous, threatening posts' on this site, asking me to address the issue, as she is worried about how it might-may incite people to act moving forward. Let me make one thing as crystal clear as possible to-as I continue with my comments to the residents: I embrace the fact that we live in a country where people can have different viewpoints. I respect everyone's right to voice those viewpoints under the First Amendment. I can appreciate that some people have questions on the O'Keefe case, based on the limited information they have seen thus far. However, what I cannot accept is witnesses, let me repeat that, witnesses—these are residents who have not been charged with any crimes—being bullied in their homes, at their children's games, or on vacation, all under the guise of the First Amendment. This is a really slippery slope that, if allowed to continue, will cause a rapid decline in the amount of people who would ever step forward to be a witness in a case and, quite possibly, the slow erosion of the criminal justice system.[9]

AA006 at ¶ 26. Rafferty was complaining about the investigative journalism provided by Aiden Kearney, who has been the lead journalist exposing the corruption (or at least appearance thereof) committed by the Canton Police. Two months later, on October 11, 2023, Kearney was (in seeming retaliatory fashion) charged with six counts of intimidation under Mass. Gen. Laws, ch. 268, § 13B, and one count of conspiracy to do so. *See Commonwealth v. Kearney*, Docket Nos. 2355CR001150, 2355CR001151, 2355CR001152, 2355CR001154, 2355CR-001155, 2355CR001156, and 2355CR001157, in the Stoughton District Court.

To protest against what appears to be anticipated perjury in Read's upcoming trial, Appellants and other members of the public gathered on Sunday, November 5,

---

[9] Available at: https://cantonmaselectboard.podbean.com/e/select-board-of-august-9-2023/, beginning at approximately 18:00, (last accessed Mar. 16, 2024).

2023, across the street from Chris Albert's business, D&E Pizza. AA007 at ¶ 29. At that protest, Appellants held signs that had inoffensive slogans like "Free Karen Reed" and "Justice." *Id.* at ¶ 30. Appellees Officers Robert Zepf, Michael Chin, and Anthony Pascarelli, and Sgt. Joseph Silvasy, members of the Canton Police Department, drove by the protest several times, attempting to intimidate the protesters into leaving. *Id.* at ¶ 31. These Appellees are supervised by Appellee Rafferty and necessarily act at her direction. AA008 at ¶ 33. Such intimidation is consistent with Rafferty's August 8, 2023, policy that the Appellee Canton Police Department "cannot accept" those engaged in First Amendment-protected activities *vis a vis* witnesses in the Read prosecution. *Id.* at ¶ 32.

When Appellees' intimidation tactic proved unsuccessful, Officers Robert Zepf, Michael Chin, and Anthony Pascarelli, and Sgt. Joseph Silvasy stopped and informed the protesters that they were not permitted to protest there, because if the protest could be seen by Chris Albert, they would deem it to be "witness intimidation" and Appellants would be arrested. *Id.* at ¶ 34. The officers specifically handed Appellants a copy of Mass. Gen. Laws, ch. 268, § 13A, they statute under which they threatened Appellants. *Id.* at ¶ 35. At the time Appellants sought injunctive relief below, Appellees had an open investigation into Appellants' November 5, 2023, protest, meaning they still faced potential unlawful arrest and prosecution. *See* AA034 (Email from Deputy Chief Patricia Sherrill to Jenna Rocco,

Nov. 7, 2023). Defendants-Appellees did not disclose the status of this investigation to the District Court, which resulted in charges actually being filed against Plaintiffs after the injunction was denied.[10]

Of course, none of this requires this Court to believe that Karen Read is being framed. Maybe the investigation has been all above board, despite all public indications to the contrary. None of this requires this Court to find that the Norfolk County authorities have unethically and unlawfully persecuted Aidan Kearney, the only journalist who has consistently covered the investigation and the trial. But we the people have a right to feel liquid on our leg and to say that it isn't rain.

The citizenry has a right to protest when a trial appears to be tainted, or even when it does not. Citizens can line the streets with signs that say "FREE O.J." even when an obviously guilty man is prosecuted for murder. Citizens can picket and protest and call attention to that which would otherwise be swept under the rug. If there is one thing that makes this America, it is the right to protest. Norfolk County has partially seceded. This court must retrocede it back into the Constitutional fold

---

[10] Appellants do not suggest counsel for Defendants-Appellees breached their duty of candor with the District Court. Rather, the most likely explanation is that Defendants-Appellees, members of a police department framing an innocent citizen for murder, withheld this information from their attorneys. However, their dishonesty should not be rewarded. They had a duty to be forthcoming with the lower court, rather than pretend that they were shocked at the fact that the Appellants would suggest they were about to engage in such heavy handed authoritarianism. Had the lower court been told the truth, the outcome likely would have been different.

that has protected us for generations, or it must pronounce that the rotten smell that has lingered in that Dedham courthouse will remain there for at least a bit longer.

## 2.0    PROCEDURAL HISTORY

On November 8, 2023, Appellants filed a Verified Complaint against Appellees seeking protection of their rights. AA001-AA020. Their Complaint alleged two claims: (1) for retaliation under 42 U.S.C. § 1983, on account of the direct threat to prosecute Plaintiffs under Section 13A, thereby chilling their speech; and (2) for declaratory and injunctive relief under 42 U.S.C. § 1983 and the First Amendment that Sections 13A and 13B are facially unconstitutional, void for vagueness, and unconstitutional as applied. On the same day, Appellants filed a Motion with the District Court on an emergency basis seeking a temporary restraining order and preliminary injunction concerning a planned protest on November 12, 2023.

## 3.0    RULING PRESENTED FOR REVIEW

Appellants contest the Memorandum and Order denying their motion seeking a temporary restraining order and preliminary injunction, which was entered by the District Court on November 10, 2023. ADD001-ADD013.

## SUMMARY OF THE ARGUMENT

Massachusetts's witness intimidation statutes prohibit individuals from intimidating or threatening witnesses with the intent to interfere with the judicial process. However, Appellees have turned these statutes on their heads, using them instead as a weapon against peaceful protestors who want the truth, not perjury. As applied to Appellants' protests, the statutes are unconstitutional. To the extent Appellees used them against Appellants for their speech, Appellees engaged in First Amendment retaliation.

The District Court committed reversible error by concluding that, despite the lawful and productive aims of Appellants' speech, G.L. c. 268 §§13A & 13B are not unconstitutional as applied because the statutes purportedly meet strict scrutiny in that they are narrowly tailored to serve a compelling state interest. The District Court's analysis was erroneous in two primary ways. First, there can be no compelling government interest in preventing citizens from encouraging witnesses to tell the truth. Second, because Appellants' speech was centered within a traditional public forum, the statutes do not meet the high bar of being the least speech-restrictive means of serving any compelling government interest. The District Court thus committed reversible error in finding Appellants had not shown a likelihood of success on the merits of their First Amendment claim.

The District Court erroneously determined that Appellants could not show a likelihood of success on their retaliation claim. However, Appellants' conduct was First Amendment protected speech, and Appellees' (consummated) threats of prosecution were based upon that protected conduct. The District Court further erroneously determined that, because Appellants had not (in the District Court's opinion) shown a likelihood of success, they had not shown that irreparable harm would result from the failure to issue injunctive relief. Any loss of one's First Amendment rights establishes irreparable harm.

The balance of equities and public interest favor the requested injunction. Appellees have no legitimate interest in continuing to enforce an unconstitutional restraint on speech, and the public has no interest in allowing an unconstitutional rule to survive. The harm to Appellants' First Amendment rights is ongoing, and the District Court erred in denying the injunction.

The District Court committed reversible error at nearly every step of the preliminary injunction analysis, and this Court should reverse the District Court's order denying Appellant's motion for a preliminary injunction.

## STANDARD OF REVIEW

This Court reviews the District Court's factual findings for clear error, its legal conclusions *de novo*, and its ultimate decision to deny the preliminary injunction for abuse of discretion. *See Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 21 (1st Cir. 2020). Abuse of discretion occurs where a District Court makes "a material error of law, 'ignor[es] pertinent elements deserving significant weight, consider[s] improper criteria, or, through assessing all appropriate and no inappropriate factors, plainly err[s] in balancing them.'" *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020) (quoting *Ross-Simmons v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996)). The District Court abused its discretion in denying the motion for temporary restraining order and preliminary injunction, and it committed numerous legal and factual errors.

# ARGUMENT

Appellants' local government appears to be framing a citizen for murder, and Chris Albert appears to be complicit. Appellants wish to convey this information both to the public at large and to Albert himself through First Amendment protected protest. Appellants' protest was not aimed at *intimidating* Albert or swaying him from telling the truth; quite the opposite—their protest encourages Albert to speak the truth, and to not bow to pressure to lie about what actually occurred on the night of O'Keefe's death.

Appellees would prefer to wash away any appearance of public opinion criticizing their narrative. They are intent on leveraging the power of the state to ensure that Appellants can not continue their protests. Appellees now employ two witness intimidation statutes to shut down debate. Although the statutes at issue are facially unconstitutional and void for vagueness, such a challenge adds a needless complexity at this stage of the litigation. Appellants only seek an order enjoining the unconstitutional application of the statutes to Appellants and their protest.

## 1.0    Appellants Have a Strong Likelihood of Success

To obtain a preliminary injunction, the court evaluates "(1) whether the plaintiff is likely to succeed on the merits, (2) whether he is likely to suffer irreparable harm in the absence of immediate relief, (3) the balance of equities, and (4) whether granting the injunction is in the public interest." *Norris*, 969 F.3d at 22.

"In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis," such that "irreparable injury is presumed upon a determination that the movants are likely to prevail on their First Amendment claim." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10-11 (1st Cir. 2012) (per curiam). At this stage, the "court need not conclusively determine the merits of the movant's claim; it is enough for the court simply to evaluate the likelihood … that the movant ultimately will prevail on the merits." *Ryan*, 974 F.3d at 18. Appellants are likely to prevail on their claim that Mass. Gen. L. c. 268, §§13A and 13B are unconstitutional as applied.

### 1.1    The Statutes Are Unconstitutional as Applied to Appellants

The District Court  correctly determined that although Appellants' protesting was within the ambit of First Amendment protections and, therefore, any government restrictions on that speech must satisfy strict scrutiny. However, the District Court erroneously determined that Appellees' application of Sections 13A and 13B against Appellants was not unconstitutional, satisfying strict scrutiny.

An as-applied challenge to a statute argues that the statute's application in a particular context is unconstitutional. *See Ada v. Guam Soc'y of Obstetricians & Gynecologists*, 506 U.S. 1011 (1992). Such a challenge tests the constitutionality of a statute "in one particular fact situation while refusing to adjudicate the

constitutionality of the law in other fact situations." *McGuire v. Reilly*, 386 F.3d 45, 61 (1st Cir. 2004).

To begin, it is necessary to examine the text of the statutes under which Appellees first threatened to apply to Appellants and then actually did apply to Appellants through levying criminal charges. G.L. c. 268, § 13A ("Section 13A") states, in relevant part:

> Whoever, with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any … witness…, in the discharge of his duty, pickets or parades … in or near a building or residence occupied or used by such …witness, … shall be punished by a fine of not more than five thousand dollars or by imprisonment for not more than one year, or both.

Similarly, G.L. c. 268, § 13B(b) ("Section 13B") states, in relevant part:

> Whoever willfully, either directly or indirectly: …(iii) misleads, intimidates or harasses another person who is a: (A) witness or potential witness … with the intent to or with reckless disregard for the fact that it may; (1) impede, obstruct, delay, prevent or otherwise interfere with: … a trial or other criminal proceeding of any type … shall be punished by imprisonment in the state prison for not more than 10 years or by imprisonment in the house of correction for not more than 21/2 years or by a fine of not less than $1,000 or more than $5,000 or by both such fine and imprisonment. If the proceeding in which the misconduct is directed at is the investigation or prosecution of a crime punishable by life imprisonment or the parole of a person convicted of a crime punishable by life imprisonment, such person shall be punished by imprisonment in the state prison for not more than 20 years or by imprisonment in the house of corrections for not more than 21/2 years or by a fine of not more than $10,000 or by both such fine and imprisonment.

When applied to the specific facts here, including both the conduct of the Appellants and their intent their protest, the statutes fail to meet constitutional scrutiny and fail to survive an as-applied challenge.

### 1.2 The Statutes Unconstitutionally Discriminate Based Upon the Content and Viewpoint of Appellants' Speech

There is no dispute Appellants' speech consisted solely of congregating across the street from Chris Albert's business and holding signs with inoffensive slogans like "Free Karen Reed" and "Justice." *See* AA007 at ¶¶ 29-30. Such an innocuous, peaceful protest taking place within a traditional public forum is entitled to protection under the First Amendment, as applied to the Commonwealth and its subdivisions through the Fourteenth Amendment. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

Appellants' protests were held within a traditional public forum and are thus entitled to greater protection. A traditional public forum is property "which by long tradition or by government fiat ha[s] been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Such "quintessential public forums," include "parks, streets, and sidewalks." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 817 (1985). Restrictions to speech within a traditional public forum must be "justified without reference to the content of the regulated speech," be "narrowly tailored to serve a significant governmental

interest," and "leave open ample alternative channels for communication." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

Appellees' restriction of the right to protest is unconstitutional as applied because it engages in content-based speech regulation. As a threshold matter, the manner of protest in which Appellants engaged on November 5, 2023, which they have been chilled from since, and in which they wish to engage again in the future, is protected under the First Amendment. Appellees' arguments as to why they should be able to silence Appellees' speech are unavailing and do not satisfy strict scrutiny.

Although the freedom of speech may be regulated by reasonable time place and manner restrictions, "peaceful demonstrations in public places are protected by the First Amendment." *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972); *Snyder v. Phelps*, 562 U.S. 443, 456 (2011). These First Amendment protections extend to protests and demonstrations which may take place on city streets and in public parks. *See Shuttlesworth v. Birmingham*, 394 U.S. 147, 153 (1969). The government may impose "reasonable restrictions on the time, place, or manner of protected speech;" however, any such restrictions must be "'justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) quoting *Clark*, 468 U.S. at 293 (1984).

"[A] speech regulation is content based if the law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 171. This Circuit recognizes that, as a general rule, "the government cannot inhibit, suppress, or impose differential content-based burdens on speech." *McGuire*, 260 F.3d at 42. Such laws are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163, citing *R. A. V. v. St. Paul*, 505 U. S. 377, 395 (1992); *Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd.*, 502 U.S. 105, 115, 118 (1991).

Likewise, viewpoint discrimination occurs when there is a "governmental intent to intervene in a way that prefers one particular viewpoint in speech over other perspectives on the same topic." *Ridley v. M.B.T.A.*, 390 F.3d 65, 82 (1st Cir. 2004). Dictating how a speaker may present a criticism is viewpoint discrimination. *Morse v. Frederick*, 551 U.S. 393, 436 (2007) ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction"), quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828-29 (1995)); *Clark*, 468 U.S. at 293 (a restriction is content neutral if it is "justified without reference to the content of the regulated speech"). Such statutes are presumed to be unconstitutional "[t]o provide maximum assurance that the government will not throw its weight on

the scales of free expression, thereby 'manipulating … public debate through coercion rather than persuasion.'" *McGuire*, 260 F.3d at 43. As the District Court correctly recognized, both Section 13A and Section 13B are content-based restrictions, and the government must meet strict scrutiny, meaning that the application must be "narrowly tailored to serve a significant governmental interest, and … 'leave open ample alternative channels for communication of the information.'" *Ward*, 491 U.S. at 791, quoting *Clark*, 468 U.S. at 293.

Here, Section 13A and Section 13B discriminate based upon content and viewpoint because they are being used specifically against speech which conveys a particular message from a particular viewpoint, *i.e.*, "the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any … witness…," G.L. c. 268, § 13A, and with the "with the intent to … impede, obstruct, delay, prevent or otherwise interfere with: … a trial or other criminal proceeding of any type," G.L. c. 268, § 13B. Put more succinctly, both statutes criminalize words which carry the intent of the speaker to purportedly influence a witness or interfere with a criminal proceeding. They do not criminalize the particular conduct, *e.g.*, picketing within the proximity of a witness or speaking with a witness, they instead criminalize the particular intent behind the conduct. The courts of Massachusetts recognize this, at least as to Section 13B. *See Comm. v.*

*Frazier*, 99 Mass. App. Ct. 1120, 167 N.E.3d 909 (2021) (applying strict scrutiny analysis to Section 13B).

As the District Court correctly recognized, other courts have similarly found that witness intimidation statutes discriminate based on the content of speech and thus must meet strict scrutiny. In *Picard v. Magliano*, the Second Circuit decided that a New York statute which criminalizes "demonstrations or protests concerning the conduct of a trial being held in [a] courthouse," but otherwise allows similar demonstrations on other topics, is a content-based regulation on speech. 42 F.4th 89, 102 (2d Cir. 2022). Likewise, here, a demonstration across the street from Chris Albert's business in support of nuclear disarmament, for instance, would clearly not violate either statute.

Other courts reached similar conclusions based on statutes written specifically to address witness intimidation. *See, e.g., Townsend v. Basterrechea*, No. 1:16-cv-151-BLW, 2017 U.S. Dist. LEXIS 8450, at *6 (D. Idaho Jan. 18, 2017) (statute criminalizing willfully intimidating or harassing a witness "by any manner" was content-based regulation). Accordingly, both Section 13A and Section 13B are content and viewpoint-based restrictions and must meet strict scrutiny.

### 1.3    Appellees' Actions Do Not Satisfy Strict Scrutiny

While the District Court was correct in applying strict scrutiny to Appellants' as-applied challenge to Sections 13A and 13B, it erred in deciding that the statutes

met that high bar. First, the government has no compelling interest in a demonstrator encouraging a witness to testify truthfully, much less in a demonstrator merely holding up a sign that says "JUSTICE." AA007 at ¶ 30. The District Court determined that the statutes "serve the compelling interests in protecting the orderly administration of justice." ADD009. Here, the interest identified by the District Court is too broad. Although a compelling government interest might be to encourage witnesses to tell the truth and to prevent bad actors from preventing honest witnesses from testifying, the interest identified by the District Court reaches much further. In this way, "protecting the orderly administration of justice" cannot be served by preventing a demonstrator from holding a sign that reads "Justice" in an area where he or she might be visible to a witness in a case. "Protecting the orderly administration of justice" could be used to enjoin the media from reporting on court proceedings. "Protecting the orderly administration of justice" could mean you cannot lobby a legislator to vote against a judicial nominee or to expand the number of seats on a court. It is not a well-defined or compelling interest in and of itself.

Second, even if Appellees could show that the government has a compelling state interest, Sections 13A and 13B are not narrowly tailored to achieve that interest, especially not in their application here. The statutes reach much further than necessary to reach this goal of the "administration of justice." If the statutes were narrowly tailored, they could instead more specifically criminalize attempting to

dissuade a witness from participating in the judicial process or explicitly attempting to procure knowingly perjurious testimony. Instead, the statute widely captures all such speech which is directed at a witness for any purpose whatsoever, necessarily including attempts to encourage a witness to tell the truth.[11] Since there can be no compelling government interest in suborning perjury, and since the statute includes such speech aimed to avoid such a situation, the statue is not narrowly tailored.

Further, the limitless geographical scope of the statutes here means the statutes are not narrowly tailored. Plaintiffs-Appellants were across the street. In reaching its conclusion that the statutes met strict scrutiny, the District Court relied heavily on *Cox v. Louisiana*, which held that a Louisiana statute criminalizing picketing or parading near a courthouse with the intent to influence a judge, juror, witness, or court officer, met the compelling interest of "protecting its judicial system from the pressures which picketing near a courthouse might create." *See* 379 U.S. 559, 560, 562 (1965). The compelling interest identified by the District Court here does not match any interest actually served by Sections 13A and 13B. The statute in *Cox* identified a specific geographic restriction—the area surrounding a courthouse. Judges, witnesses, jurors, and court officers can not avoid the influence

---

[11] Appellants cannot even put up a sign saying "pineapple doesn't belong on pizza" if D&E sells such, because Appellees would undoubtedly view that as an attempt to threaten Albert's livelihood on account of his testimony, though "we love pineapple pizza" would not be threatened. (This Court should make any finding that pineapple on pizza is acceptable, however, not even in dicta).

of a protestor who is demonstrating on the court steps, and such disruption is more likely to influence. The statutes at issue here instead criminalize protesting anywhere that a witness might be present. If they were in a house across the street or if Albert were going house to house to knock on doors to campaign for reelection, Appellees would still criminalize speech within that house.

Finally, the District Court failed to give sufficient weight to the fact that the speech at issue here—speech which the statutes purport to criminalize—took place within a traditional public forum, which entitles Appellants to heightened protections. "When a restriction on speech in a traditional public forum targets the content of speech, that restriction raises the special concern 'that the government is using its power to tilt public debate in a direction of its choosing.'" *March v. Mills*, 867 F.3d 46, 54 (1st Cir. 2017), quoting *Cutting v. City of Portland*, 802 F.3d 79, 84 (1st Cir. 2015). A content-based restriction on speech within a traditional public forum "may be upheld only if that law uses ***the least speech restrictive means*** to serve what must be a compelling governmental interest." *Id.* (emphasis added), citing *Globe Newspaper Co. v. Beacon Hill Architectural Comm'n*, 100 F.3d 175, 182 (1st Cir. 1996). The District Court failed to even determine that application of the statutes here was the *least restrictive means* to serve the state's alleged compelling interest. Even if the statutes were narrowly tailored, as discussed *supra*, the statutes are not narrowly tailored to such a degree as to avoid criminalizing

speech on matters of public interest (a murder case attracting national attention), made in a traditional public forum (on a city sidewalk), and for a charitable reason (encouraging a witness to tell the truth). Because the application of the statutes here is not the least restrictive means necessary to meet a compelling government interest, they are unconstitutional.

### 1.4 Appellees Engaged in Unconstitutional Retaliation Based Upon Appellees' Speech

Appellants are likely to succeed on their retaliation claim. Appellees' conduct in threatening Appellants with arrest and/or prosecution as a result of their speech was retaliatory, and the District Court erred in not enjoining Appellees. To succeed on a First Amendment retaliation claim, a plaintiff must show that "(1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." *D.B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012); *Najas Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134, 141 (1st Cir. 2016).

First, as discussed at length *supra*, Appellants engaged in constitutionally protected speech. Appellants protested on a city sidewalk, a traditional public forum, and displayed signs in support of speaking the truth about the framing of Karen Read. *See* AA007 at ¶¶ 29-30.

Second, Appellants were subject to an adverse action. Appellees threatened to arrest and/or prosecute Appellants if they continued their demonstrations, and in fact

did arrest them for their speech. *See* AA008, at ¶¶ 34-35; *See also Canton Police Dept. v. Corby,* Docket No. 2355AC001047 (Stanton Dist. Ct.); *Canton Police Dept. v. O'Neil,* Docket No. 2355AC001043(Stanton Dist. Ct.).

Accordingly, Appellees' credible threat of arrest was itself the adverse action which chilled Appellants' speech, and the actual prosecution even more so.[12]

Third, Appellants made sufficient allegations that connecting the adverse action to the protected conduct to demonstrate a likelihood of success on its retaliation claim. "Causation is established by showing that the plaintiff's conduct was a 'substantial' or 'motivating' factor in bringing about the allegedly retaliatory action." *Goldstein v. Galvin*, 719 F.3d 16, 30 (1st Cir. 2013), quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). A court may find that the protected conduct was a substantial or motivating factor in the adverse action unless the defendant shows that it would have made the same decision in the absence

---

[12] The District Court correctly determined that Plaintiffs-Appellants have standing to bring their claims and seek injunctive relief, and Defendants-Appellees have not cross-appealed on the issue. There should be no question here that Appellants have standing since they have alleged an actual injury (*i.e.* the adverse action of the threat and consummated prosecution chilling speech), the injury can fairly be traced to the challenged conduct (the application of Sections 13A and 13B), and the injury can be redressed by the declaratory, injunctive, and monetary relief requested. *See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 47 (1982); *Weber v. Cranston School Committee*, 212 F.3d 41, 47 (1st Cir. 2000). Moreover, "when the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *Gilley v. Stabin*, Nos. 23-35097, 23-35130, 2024 U.S. App. LEXIS 5629, at *4 (9th Cir. Mar. 8, 2024).

of the protected conduct. *Powell v. Alexander*, 391 F.3d 1, 17 (1st Cir. 2004). Here, Appellants' protected speech was indisputably the precipitating factor of Appellees' adverse action; because Appellees' threats to and prosecution of Appellants stem solely from Appellants' demonstrations, the causal connection is established. Accordingly, Appellants are likely to succeed on their retaliation claim and the District Court erred in finding otherwise.

## 2.0    The Remaining Factors Favor Injunctive Relief

In the absence of an injunction, Appellants will suffer irreparable harm, the balance of equities favors them, and the public interest necessitates an injunction.

### 2.1    Appellants Will Suffer Irreparable Harm

Although the District Court correctly recognized that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), it failed to correctly find that Appellants were at risk of irreparable harm. Where "plaintiffs have made out a plausible claim of a 'chilling effect' on their rights of expression", this "showing meets the 'irreparable harm' requirement … in the context of the first amendment[.]" *Maceira v. Pagan*, 649 F.2d 8, 18 (1st Cir. 1981). Thus, as Appellants have a likelihood of success on the merits of its First Amendment claim, they necessarily also establish irreparable harm. *Fortuño*, 699 F.3d at 15.

Here, the Court's decision erred in two ways. First, the District Court erred in failing to recognize that Appellants have a likelihood of success on the merits of their claims, and thus have suffered irreparable harm and will continue to suffer irreparable harm if injunctive relief is not granted. Appellants are likely to succeed on the merits of their claims, and thus this factor favors granting relief.

Second, the Court inexplicably determined that Appellants' speech was not actually chilled, and that Appellants were not actually at risk of arrest in continuing their demonstrations. *See* ADD012. In reality, Appellants specifically pleaded that: (1) Appellees threatened Appellants with arrest if they continued their protest, and (2) that they abandoned their plans to move forward with an additional demonstration on a future date. *See* AA008-AA009 at ¶¶ 34-35, 39-40.

Additionally, although the District Court did not have the benefit of such knowledge at the time, it bears repeating that **Appellees did actually charge Appellants with crimes under Sections 13A and 13B for this very demonstration and withheld this information from the District Court.** *See Canton Police Dept. v. Corby,* Docket No. 2355AC001047 (Stanton Dist. Ct.); *Canton Police Dept. v. O'Neil,* Docket No. 2355AC001043(Stanton Dist. Ct.).

The District Court may have tried its hand at prognosticating the likelihood of such a result, but its failed assessment of Appellees' intentions suggests a wider misunderstanding of how intent Appellees are on silencing the Appellants. That the

District Court waved away this possibility without significant analysis lends to the conclusion that the District Court made other errors in its Order. Accordingly, Appellants suffered irreparable harm and will continue to suffer irreparable harm until an injunction is entered allowing them to continue with their speech.

## 2.2 The Balance of Hardships Favors Appellants

When the government restricts First Amendment rights, the balance of hardships weighs in a plaintiff's favor. *See Firecross Ministries v. Municipality of Ponce*, 204 F. Supp. 2d 244, 251 (D.P.R. 2002) (holding that "insofar as hardship goes, the balance weighs heavily against Defendants, since they have effectively silenced Plaintiffs' constitutionally protected speech"); *see also Cmty. House, Inc. v. City of Boise,* 490 F.3d 1041, 1059 (9th Cir. 2007) ("The fact that the plaintiffs have raised serious First Amendment questions compels a finding that … the balance of hardships tips sharply in the plaintiffs' favor.") (cleaned up). The Plaintiffs' "interest in avoiding interference with their rights to free speech outweighs the State's interest in enforcing an unconstitutional law." *Cent. Me. Power Co. v. Me. Comm'n'n on Governmental Ethics & Election Pracs*., No. 1:23-cv-00450-NT, 2024 U.S. Dist. LEXIS 34853, at *48 (D. Me. Feb. 29, 2024) (cleaned up).

Here, the balance of hardships favors Appellants. On one hand, Appellees wish to publicly speak about their belief that Karen Read is being framed and that Chris Albert is helping facilitate that framing. Appellants wish to continue to make

this speech in Chris Albert's vicinity in order to encourage him to tell the truth. On the other hand, Appellees wish to prevent Chris Albert and the other citizens of the Town of Canton from hearing such speech. Even if Read is actually guilty of killing O'Keefe, Appellees introduced no evidence that Albert is so weak-minded that he would perjure himself and blame someone else. The risk of harm from allowing the speech is minimal when compared with the serious harm that befalls Appellants from preventing the speech. Accordingly, the balance of harms favors Appellants and the District Court erred in finding otherwise.

### 2.3 The Public Interest Favors an Injunction

"Protecting rights to free speech is *ipso facto* in the interest of the general public." *McBrearty v. Sch. Bd. of RSU22*, 616 F. Supp. 3d 79, 98 (D. Me. 2022). The public interest "favors protecting First Amendment rights." *Kelly v. City of Parkersburg*, 978 F. Supp. 2d 624 (S.D. W.V. 2013); *see also Carey v. FEC*, 791 F. Supp. 2d 121, 135-36 (D. D.C. 2011); *Mullin v. Sussex Cnty., Del.*, 861 F. Supp. 2d 411, 428 (D. Del. 2012). For the same reason that the balance of hardships favors Appellants, the public interest also favors Appellants—their encouragement to a witness to speak the truth is a net benefit to the Town of Canton, and there is no benefit to suppressing such speech. "[T]he public interest could not be served by allowing enforcement of an unconstitutional bar on First Amendment-protected

political speech." *Cent. Me. Power Co., supra* at *48, citing *Fortuño*, 699 F.3d at 15. Thus, all four preliminary injunction factors are met.

## CONCLUSION

In light of the foregoing, the Order denying the motion for temporary restraining order and preliminary injunction should be reversed, and the District Court should be direct to enjoin Appellees' actions interfering with Appellants' right to lawfully engage in constitutionally protected expression, including, but not limited to, enjoining actual or threatened enforcement of Sections 13A and 13B.

Date: March 18, 2024.            Respectfully submitted,

/s/ Marc J. Randazza
Marc J. Randazza (Bar No. 90629)
Jay M. Wolman (Bar No. 1135959)
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (888) 887-1776
ecf@randazza.com

*Attorneys for Appellants*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(B), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 7,711 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Date: March 18, 2024.                    RANDAZZA LEGAL GROUP, PLLC

                                         /s/ Marc J. Randazza
                                         MARC J. RANDAZZA

# CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: March 18, 2024.                    RANDAZZA LEGAL GROUP, PLLC

                                          /s/ Marc J. Randazza
                                          MARC J. RANDAZZA

*In the*

# UNITED STATES COURT OF APPEALS

*for the*

# FIRST CIRCUIT

MEREDITH O'NEIL, JESSICA SVEDINE,
DEANNA CORBY, AND ROBERTO SILVA,

*Plaintiffs-Appellants,*

v.

CANTON POLICE DEPARTMENT, THE TOWN OF CANTON,
MASSACHUSETTS, HELENA RAFFERTY, AS CHIEF OF THE CANTON
POLICE DEPARTMENT AND IN HER PERSONAL CAPACITY, AND OFFICER
ROBERT ZEPF, OFFICER MICHAEL CHIN, OFFICER ANTHONY
PASCARELLI, AND SARGEANT JOSEPH SILVASY, IN THEIR
OFFICIAL CAPACITIES,

*Defendants-Appellees.*

*On Appeal from the United States District Court
for the District of Massachusetts
No. 1:23-cv-12685-DJC
The Honorable Denise J. Casper*

## APPELLANTS' ADDENDUM

MARC J. RANDAZZA
JAY M. WOLMAN
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (888) 887-1776
ecf@randazza.com

*Attorneys for Appellants*

# ADDENDUM TABLE OF CONTENTS

| Document Description | Pages |
|---|---|
| Memorandum and Order Denying Plaintiffs' Motion for a Temporary Restraining Order and for a Preliminary Injunction, Dkt. No. 13 (November 10, 2023) | ADD001-ADD013 |
| Notice of Appeal, Dkt. No. 23 (December 10, 2023) | ADD014-ADD015 |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **MEREDITH O'NEIL, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 23-cv-12685-DJC** |
| ) | |
| **CANTON POLICE DEPARTMENT, et al.** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                              **November 10, 2023**

### I.    Introduction

Two days ago, on November 8, 2023, Plaintiffs Meredith O'Neil, Jessica Svedine, Deanna

Corby, Nick Rocco, Jenna Rocco and Roberto Silva (collectively, "Plaintiffs") filed this lawsuit

against Defendants Canton Police Department, Town of Canton, Helena Rafferty, Robert Zepf,

Michael Chin, Anthony Pascarelli and Joseph Silvasy (collectively, "Defendants"), alleging

retaliation as to the exercise of their First Amendment rights under 42 U.S.C. § 1983 (Count I) and

a declaratory judgment regarding the unconstitutionality of Mass. Gen. L. c. 268, §§ 13A, 13B,

the witness intimidation statute, facially and as-applied to Plaintiffs (Count II).[1]  D. 1.  On the

same day, Plaintiffs moved on an emergency basis for a temporary restraining order and

preliminary injunction concerning a planned protest on Sunday, November 12, 2023, D. 4.  Given

the timing of the request, after counsel for Defendants filed a notice of appearance yesterday, D.

---

[1] The Court recognizes that the Canton Police Department is not an independently suable entity,
see Dwan v. City of Boston, 329 F.3d 275, 278 n.1 (1st Cir. 2003); Stratton v. City of Boston, 731
F. Supp. 42, 46 (D. Mass. 1989), and, therefore, has considered Plaintiffs' claims as asserted
against the other Defendants.

**ADD001**

9–10, the Court set an expedited schedule for a response to the motion by Defendants, D. 11, which Defendants have now filed, D. 12.[2]   Having considered the parties' filings and for the reasons stated below, the Court DENIES Plaintiffs' motion for injunctive relief, D. 4.

## II.   Standard of Review

In deciding Plaintiffs' motion for injunctive relief (whether framed as a motion for a temporary restraining order or preliminary injunction), the Court must consider four factors:  "[1] the movant[s'] likelihood of success on the merits of [their] claims; [2] whether and to what extent the movant[s] will suffer irreparable harm if the injunction is withheld; [3] the balance of hardships as between the parties; and [4] the effect, if any, that an injunction (or the withholding of one) may have on the public interest."  Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013) (citing Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996)); see Latin Am. Music Co. v. Cardenas Fernandez & Assoc., Inc., 2 F. App'x 40, 42 n.2 (1st Cir. 2001) (recognizing that four-factor test for preliminary injunctions applies to temporary restraining orders).  The movant "bears the burden of establishing that these four factors weigh in its favor." Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006) (citation omitted); see McKenzie v. Option One Mortg., 321 F. Supp. 3d 186, 188 (D. Mass. 2018). The Court must bear in mind that the issuance of any preliminary injunctive relief "is an extraordinary and drastic remedy."  Allscripts Healthcare, LLC v. DR/Decision Res., LLC, 592 F. Supp. 3d 1, 3 (D. Mass. 2022) (quoting Peoples Federal Sav. Bank v. People's United Bank, 672 F.3d 1, 8–9 (1st Cir. 2012)).  Since "[l]ikelihood of success [on the merits] is the main bearing wall of [this] framework," Ross-Simons, 102 F.3d at 16; Coquico, Inc. v. Rodríguez-Miranda, 562 F.3d 62, 66 (1st Cir. 2009), the Court begins its analysis below with this factor.

---

[2] Also, given the timing of the request and the "emergency" nature of the motion, the Court denies the request for a hearing and has instead decided this matter on the papers filed by the parties.

**ADD002**

### III.    Factual Background

The following factual allegations are drawn from Plaintiffs' verified complaint, D. 1, and the exhibits attached thereto.  Plaintiffs are private citizens who believe that the defendant in a pending state criminal proceeding, Karen Read ("Read"), has been framed for the death of her romantic partner, John O'Keefe ("O'Keefe"), by various residents of the Town of Canton (the "Town"). D. 1 ¶¶ 1, 10–23, 28.  Read's criminal trial is scheduled for March 2024, D. 1-1 at 11, and Plaintiffs report widespread public interest in her prosecution. D. 1 ¶¶ 23–24; D. 1-1.  Various members of the public who believe in Read's innocence have staged public demonstrations in her support.  D. 1 ¶¶ 24–25.  During an August 8, 2023 meeting of the Town select board, Police Chief Helena Rafferty ("Rafferty") referred to events "that made residents of our community feel disrespected, targeted, and intimidated."  Id. ¶ 26.  Rafferty stated that she "respect[s] everyone's right to voice [different] viewpoints under the First Amendment" but "cannot accept . . . witnesses—these are residents who have not been charged with any crimes—being bullied in their homes, at their children's games, or on vacation, all under the guise of the First Amendment."  Id.

On November 5, 2023, Plaintiffs participated in a protest in front of a business in Canton, owned by a Town selectman, Chris Albert ("Albert"), who allegedly saw Read and O'Keefe the night of O'Keefe's death.  Id. ¶¶ 12–13, 29.  Also alleged by Plaintiffs, Albert is a family member of individuals whom Read's supporters believe were involved in covering up O'Keefe's murder and framing Read.  Id. ¶¶ 12–13, 17–19.  Albert is also himself a potential witness in the case.  See id.  ¶ 60 (referring to Albert's "expected testimony").   At the protest, Plaintiffs held signs with slogans such as "Free Karen Reed" and "Justice."  Id. ¶ 30.  Police Officers Robert Zepf, Michael Chin, and Anthony Pascarelli, and Sergeant Joseph Silvasy (collectively, the "Police Officer Defendants") drove by the protest several times and then "stopped and informed the protestors

**ADD003**

they were not permitted to protest there, because if the protest could be seen by Albert, they would deem it to be 'witness intimidation' and Plaintiffs would be arrested." Id. ¶¶ 31, 34.  The Police Officer Defendants handed Plaintiffs a copy of Mass. Gen. L. c. 268, § 13A, a provision of the Commonwealth's witness intimidation statute.  Id. ¶ 35.  Plaintiffs refer to a planned protest this Sunday, November 12, 2023 and have alleged that their plans to proceed with same have been chilled by the actions of Defendants.  Id. ¶¶ 39–40.  Accordingly, Plaintiffs assert that injunctive relief now "is necessary to permit Plaintiffs to peacefully protest this upcoming Sunday, November 12, 2023."  D. 4 at 1 (emphasis removed).

## IV.   Discussion

### A.   <u>Reasonable Likelihood of Success on the Merits</u>

To obtain injunctive relief at this early stage of the litigation, Plaintiffs bear the burden of showing that they have a reasonable likelihood of success of either their claims, Count I (First Amendment retaliation) or Count II (challenging the constitutionality of provisions of the state witness intimidation statute).   At their core, both claims challenge the intersection of the First Amendment and the state witness intimidation statute.  Mass. Gen. L. c. 268 § 13A, in relevant part, provides that anyone "with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any . . . witness, . . . in the discharge of his duty, pickets or parades . . . in or near a building or residence occupied or used by such . . . witness" shall be subject to criminal penalty.  Mass. Gen. L. c. 268 § 13B, in relevant part, also provides criminal penalty for "[w]hoever, willfully, either directly or indirectly . . . misleads, intimidates or harasses another person who is a:  (A) witness or potential witness . . . with the intent to or with reckless disregard for the fact that it may; (1) impede, obstruct, delay, prevent or otherwise interfere with: . . . a trial or other criminal proceeding of any type . . . or (2) punish, harm

**ADD004**

or otherwise retaliate against any such person described in this section for such person or such person's family member's participation in any [such] proceedings."[3]

### 1.    *Plaintiffs' Standing*

Before addressing the reasonable likelihood of success of Plaintiffs' claims, the Court turns to the threshold issue of standing as Defendants invoke same in their opposition.  D. 12 at 7.  To establish constitutional standing, "[a] plaintiff must show:  that (1) he or she personally has suffered some actual or threatened injury as a result of the challenged conduct; (2) the injury can be fairly traced to that conduct; and (3) the injury likely will be redressed by a favorable decision from the court."  Mangual v. Rotger-Sabat, 317 F.3d 45, 56 (1st Cir. 2003) (citation omitted).  In asserting their First Amendment challenge, Plaintiffs may establish a concrete injury by alleging either that they intend to engage in a course of conduct arguably implicating their First Amendment rights for which they face "a credible threat of prosecution" or by alleging that they were "chilled" from exercising their First Amendment rights "to avoid enforcement consequences." Id. at 56–57. Although "the fear of prosecution must be 'objectively reasonable[,]' . . . the evidentiary bar that must be met is extremely low" and "[a] party need not violate the statute and suffer the penalty in order to generate a conflict worthy of standing in federal court."  Id. (quoting R.I. Ass'n of Realtors, Inc. v. Whitehouse, 199 F.3d 26, 31 (1st Cir. 1999).  That is, "[p]re-enforcement challenges to criminal statutes are cognizable under Article III."  Picard v. Magliano, 42 F.4th 89, 97 (2d Cir. 2022) (internal citation and quotation marks omitted).  Accordingly, a plaintiff has suffered an injury in fact and has standing when facing threatened enforcement of law that is

---

[3] Although Count II of the complaint challenges the constitutionality of the statute both facially and as-applied to Plaintiffs, D. 1 ¶¶ 51–61, Plaintiffs only rely upon their as-applied challenge to the statute and their First Amendment retaliation claim in their motion to assert a reasonable likelihood of success on the merits. D. 5 at 8. Accordingly, the Court confines its analysis to these two claims.

**ADD005**

"sufficiently imminent." Id. (internal citation and quotation marks omitted).   Nevertheless, "[p]articular weight must be given to the [g]overnment disavowal of any intention to prosecute on the basis of the [g]overnment's own interpretation of the statute and its rejection of plaintiffs' interpretation as unreasonable." Blum v. Holder, 744 F.3d 790, 798 (1st Cir. 2014).

Here, Plaintiffs argue they face a credible threat of prosecution based on the Police Officer Defendants' statement that Plaintiffs would be arrested for witness intimidation if they protested within view of the witness.  D. 1 ¶ 34; D. 5 at 6.  It is not clear from the record whether Plaintiffs have same or similar basis for injury-in-fact and standing as, for one example, the plaintiff in Picard, 42 F.4th at 97–98, who had been arrested (but the prosecution of same was abandoned) for violation of a New York law prohibiting people from, among other things "hold[ing] or display[ing] placards or signs containing written or printed matter, concerning the conduct of a trial being held in such courthouse or the character of the court or jury engaged in such trial or calling for or demanding any specified action or determination by such court or jury in connection with such trial." Id. at 95.  Here, Plaintiffs rely upon the Police Officer Defendants' alleged statements about possible arrest and their distribution of a copy of Mass. Gen. L. c. 268 § 13A.  D. 1 ¶¶ 34–35.  It is not clear that such circumstances show a sufficiently imminent threat of arrest as to both §§ 13A and 13B, particularly where Plaintiffs make no allegations regarding their individual conduct during the November 5, 2023 protest or their conduct during the planned November 12, 2023 protest.  Plaintiffs further rely upon a Canton Police Department reply to a public records request that denied the same on the basis of an exemption from disclosure for an "ongoing investigation." D. 1 ¶ 36; D. 1-2.  The reference to an "ongoing investigation" does not suggest on this record that such investigation concerns these particular Plaintiffs or charges against

**ADD006**

them under §§ 13A and 13B, such that the Court could conclude that their arrest or prosecution is sufficiently imminent.[4]

That having been said, there has been no disavowal of Defendants not to charge Plaintiffs or that their interpretation of statute is unreasonable.  For all of these reasons and at this early juncture and on the factual record before it, the Court assumes that Plaintiffs have met the "extremely low" bar in this context and have shown  injury-in-fact traceable to Defendants' conduct that would be redressed by the relief that they seek here and proceeds to an assessment of Plaintiffs' reasonable likelihood of success on the merits of Plaintiffs' claims.

### 2.  As-Applied First Amendment Challenge

An as applied challenge "requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right." Picard, 42 F.4th at 101; see McGuire v. Reilly, 386 F.3d 45, 61 (1st Cir. 2004) (explaining that "the as-applied challenge is then an attempt to 'specify' the law by freshly testing its constitutionality in one particular fact situation").

### a)  Appropriate Level of Scrutiny

"[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 647 (1981).  Under the prevailing constitutional framework, the standard of judicial scrutiny warranted by a government restriction varies based on whether

---

[4] That another individual following the Read case has been criminally charged for a broader and wider course of allegedly criminal conduct, Commonwealth v. Kearney, 2023 Mass. Super. LEXIS 448, *1, 2–17 (Mass. Super. Nov. 9, 2023), does not necessarily make it more likely that Plaintiffs engaged in the November 5, 2023 protest as alleged or as planned for November 12, 2023 will be charged as well.

**ADD007**

the restriction is content-based or content-neutral.  See McCoy v. Town of Pittsfield, 59 F.4th 497, 506 (1st Cir. 2023).[5]

Content-based regulations "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.  Reed v. Town of Gilbert, Ariz., 576 U.S. 155, 163 (2015).  That is, content-based restrictions are subject to strict scrutiny.  A restriction is content-based if it "draws distinctions based on the message a speaker conveys," "cannot be justified without reference to the content of the regulated speech," or was "adopted by the government because of disagreement with the message [the speech] conveys."  March v. Mills, 867 F.3d 46, 54 (1st Cir. 2017) (quoting Reed, 576 U.S. at 164 (internal quotation marks omitted) (alteration in original)).

Following Reed, it appears that most courts have concluded that witness intimidation statutes such as the one at issue in this case are content-based and subject to strict scrutiny when applied to expressive conduct, because they limit speech related to a pending court proceeding but not speech on other subjects.  See Picard, 42 F.4th at 95, 102–03 (applying strict scrutiny to a state statute that barred speech within 200 feet of a courthouse concerning, among other things, "the conduct of a trial being held in such courthouse"); Commonwealth v. Frazier, 99 Mass. App. Ct. 1120, 2021 WL 1561358, at *2–3 (2021) (unpublished opinion) (suggesting that strict scrutiny would apply to an as-applied challenge to § 13B and citing to similar challenges to statutes in other states).  Accordingly, the Court will assess whether the provisions here are narrowly tailored to serve compelling state interests.

---

[5] The Court notes that the permitted level of restriction on speech may also vary based on whether the speech takes place on a public forum.  See Curnin v. Town of Egremont, 510 F.3d 24, 28 (1st Cir. 2007).  Here, Plaintiffs assert and Defendants do not dispute, that the speech took place on a public sidewalk.  D. 5 at 9.  The Court accepts that assertion for the purposes of deciding this motion.

**ADD008**

b)   <u>Application of Strict Scrutiny</u>

The Supreme Court has recognized the government's interest in "protecting its judicial system from the pressures which picketing near a courthouse might create." <u>Cox v. State of La.</u>, 379 U.S. 559, 562 (1965). <u>Cox</u> acknowledged that the government "may adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence" and referred to a statute banning "pickets or parades in or near a building housing a court" as "[a] narrowly drawn statute . . . necessary and appropriate to vindicate the State's interest in assuring justice under law." <u>Id.</u> at 560, 562. Although <u>Cox</u> was decided before the Supreme Court's modern jurisprudence distinguishing between content-based and content-neutral restrictions, those decisions have not overruled <u>Cox</u>. <u>Picard</u>, 42 F.4th at 105. In addition, courts have "consistently emphasized the compelling State interest in protecting witnesses from intimidation, harassment, and threats of physical violence." <u>Frazier</u>, 2021 WL 1561358, at *3. "The purpose of the statute [at issue here] is to protect witnesses from being bullied or harried so that they do not become reluctant to testify or to give truthful evidence in investigations or judicial proceedings. The larger purpose is to prevent interference with the administration of justice." <u>Commonwealth v. McCreary</u>, 45 Mass. App. Ct. 797, 799 (1998). Here, the Court concludes that §§ 13A and 13B serve the compelling interests in protecting the orderly administration of justice.

Even as applied to Plaintiffs, enforcement of the statutes is narrowly tailored to serve that compelling interest. The statute itself is narrowed by an intent requirement that aligns with the Defendants' compelling interest in protecting the administration of justice. Mass. Gen. L. c. 268 § 13A (prohibiting conduct "with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer); <u>id.</u> § 13B (prohibiting conduct "with the intent to or with reckless disregard for the fact

**ADD009**

that it may; (1) impede, obstruct, delay, prevent or otherwise interfere with: . . . a trial or other criminal proceeding of any type"); see March, 867 F.3d at 56 (finding that disruptive-intent requirement of noise provision "narrow[s] the measure's reach").  The statute is also narrowly tailored as it prohibits such picketing and parading (with the requisite intent) in or near a building or residence that he occupies.  As alleged, Plaintiffs did not gather in any other public location, but outside of Albert's place of business.  There is nothing in the statute, or as applied to Plaintiffs, that would prohibit their gathering to do the same in other locations.  Moreover, the compelling governmental interest in the orderly administration of justice is not limited to the courthouse itself as Plaintiffs seem to suggest.  See, e.g., Lafferty v. Jones, 246 A.3d 429, 452 (Conn. 2020) (affirming sanctions against defendant for remarks made on radio broadcast which "produced additional threats to those involved in the case and created a hostile atmosphere that could discourage individuals from participating in the litigation").  The fact that the protest took place outside an individual witness's place of work and involved multiple participants tends to increase, not decrease, the risk that the witness's testimony may be influenced.  See Cox, 379 U.S. at 562 (emphasizing need to shield fair trial from "influence or domination by either a hostile or friendly mob"); Lafferty, 246 A.3d at 455 (concluding that speech "was calculated to interfere with the fairness of the proceedings as it directly targeted opposing counsel").

Based on the present record, the Court concludes that Plaintiffs are not reasonably likely to succeed on the merits of their as applied First Amendment challenge against §§ 13A and 13B.

### 3.    *First Amendment Retaliation Claim (Count I)*

To prevail on a First Amendment retaliation claim, Plaintiffs must show (1) "that [their] conduct was constitutionally protected" and (2) "proof of a causal connection between the allegedly protected conduct and the supposedly retaliatory response."  Najas Realty, LLC v. Seekonk Water Dist., 821 F.3d 134, 141 (1st Cir. 2016).  Here, Plaintiffs assert constitutionally

protected conduct in the form of "their November 5, 2023, constitutionally protected speech" and an adverse action in the form of Defendants "threatening Plaintiffs with arrest."   D. 1 ¶ 42.[6]  The Court notes that "retaliatory arrest cases also present a tenuous causal connection between the defendant's alleged animus and the plaintiff's injury" because it is "it is particularly difficult to determine whether the adverse government action was caused by the officer's malice or the plaintiff's potentially criminal conduct."  See Nieves v. Bartlett, 587 U.S. __, 139 S. Ct. 1715, 1723 (2019).

In light of the Court's conclusion that Plaintiffs are not likely to succeed on their as applied to challenge to §§ 13A, 13B in Count II, and on the record before the Court here, the Court concludes that Plaintiffs are similarly not likely to succeed in establishing the requisite retaliatory animus to support Count I.  Plaintiffs' assertion that they "would not have been threatened with arrest" if they had expressed support for the witness's expected testimony is not supported by the factual allegations of the verified complaint.  D. 1 ¶ 47; see id. ¶ 26 (alleging that Rafferty expressed respect for various viewpoints regarding the Read prosecution).  On the record here, the Police Officer Defendants merely advised Plaintiffs of the existence of the witness intimidation

---

[6] Count I also invokes Plaintiffs' First Amendment right to petition the government.  Although Plaintiffs' freedom of speech and freedom to petition government for a redress of grievances are cognate rights, they are not identical.  Borough of Duryea, Pa. v. Guarnieri, 564 U.S. 379, 387 (2011).  "A petition conveys the special concerns of its author to the government and, in its usual form, requests action by the government to address those concerns."  Id. at 388–89.  Even as alleged, the complaint does not suggest that Plaintiffs were engaged in constitutionally protected petitioning of Albert in his role as a Town selectman and seeking governmental action to address their concerns regarding the Read prosecution.  Instead, Plaintiffs were concerned with Albert's "expected testimony" as a private citizen and were "encouraging him to, in their opinion, testify truthfully."  D. 1 ¶¶ 47, 60; see Najas Realty, 821 F.3d at 141 (recognizing that it was unclear whether plaintiffs were engaged in petitioning conduct when they submitted a development application to local planning board).

**ADD011**

statute and expressed an intent to enforce the law if violated.  Accordingly, the Court concludes that Plaintiffs are not likely to demonstrate a likelihood of success on the retaliation claim.

**B.**    **Risk of Irreparable Harm**

"As the Supreme Court has explained, '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 10–11 (1st Cir. 2012) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)).  Here, however, Plaintiffs have not shown a risk of irreparable harm if the injunctive relief is not granted.  Although Plaintiffs alleged that they "have determined to not move forward with a November 12, 2023, planned protest in support of Read and other similar such protests," they have provided no details regarding the planned protest and why such protest would inevitably be viewed by law enforcement as violative of §§ 13A, 13B.  Defendants are not alleged to have issued any prohibition on protests related to the Read prosecution or to have halted any peaceful, non-threatening protests regarding the Read prosecution.  Moreover, it is not clear that any exercise of free speech has been chilled where Plaintiffs have other public forum to express their views, particularly given the widespread news coverage and public interest that has already been generated regarding same, D. 1 ¶¶ 23–25.[7]

**C.**    **Balance of Harms and Public Interest**

With respect to the public interest, the Court recognizes that "[p]rotecting rights to free

---

[7] Plaintiffs argue that Defendants' "threatened enforcement" constitutes a prior restraint on speech. D. 5 at 12.  "An invalid prior restraint is a regulation that '[gives] public officials the power to deny use of a forum in advance of actual expression.'" Reddy v. Foster, No. 14-CV-299-JL, 2016 WL 1305141, at *10 (D.N.H. Apr. 1, 2016) (alteration in original) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 795 n.5 (1989)), aff'd, 845 F.3d 493 (1st Cir. 2017).  Here, Defendants do not appear to have required that Plaintiffs seek permission to engage in speech or deemed Plaintiffs' a violation of state law in advance of its actual occurrence.  For the purposes of the present motion, the Court credits Defendants' assertion that "[a]ny possible police action that may be taken in the future will be predicated upon and in response to is yet unknown conduct taken by the Plaintiffs."  D. 12 at 7.

**ADD012**

speech is ipso facto in the interest of the general public." <u>McBreairty v. Sch. Bd. of RSU 22</u>, 616 F. Supp. 3d 79, 98 (D. Me. 2022) (internal quotation marks omitted) (alteration in original) (quoting <u>Cutting v. City of Portland</u>, No. 2:13-cv-359-GZS, 2014 WL 580155, at *10 (D. Me. Feb. 12, 2014) (internal quotation marks omitted)).  In the present case, however, that interest of the Plaintiffs in obtaining the injunctive relief weighs against the Defendants' interest in enforcement of law in the Town, and consideration of the public interest in ensuring the administration of justice, including interference with witnesses.  <u>See Cox</u>, 379 U.S. at 562 (explaining "unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy"); <u>McCreary</u>, 45 Mass. App. Ct. at 799; <u>Laviena-Torres v. Colon-Alsina</u>, No. CIV. 12-1277 JAF, 2013 WL 1973249, at *14 (D.P.R. May 13, 2013) (identifying witness safety as "topic of clear public interest").

Accordingly, the Court concludes that the balance of harms between the parties and the consideration of the public interest also weigh against the injunctive relief that Plaintiffs seek.

## V.        Conclusion

For all these reasons, the Court DENIES Plaintiffs' motion for a temporary restraining order and preliminary injunction, D. 4.

So Ordered.

/s/ Denise J. Casper
United States District Judge

**ADD013**

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MEREDITH O'NEIL, JESSICA SVEDINE, DEANNA CORBY, NICK ROCCO, JENNA ROCCO, and ROBERTO SILVA,<br><br>Plaintiffs,<br><br>v.<br><br>CANTON POLICE DEPARTMENT, the TOWN OF CANTON, MASSACHUSETTS, HELENA RAFFERTY, as Chief of the Canton Police Department and in her personal capacity, and OFFICER ROBERT ZEPF, OFFICER MICHAEL CHIN, OFFICER ANTHONY PASCARELLI, and SERGEANT JOSEPH SILVASY, in their official and individual capacities,<br><br>Defendants. | Civil Action No. 1:23-cv-12685<br><br>**NOTICE OF APPEAL** |

PLEASE TAKE NOTICE that Plaintiffs Meredith O'Neil, Jessica Svedine, Deanna Corby, Nick Rocco, Jenna Rocco, and Roberto Silva (collectively "Plaintiffs"), hereby appeal to the United States Court of Appeals for the First Circuit from the Memorandum and Order entered in the above-captioned action on November 10, 2023 (ECF No. 13).

Dated: December 10, 2023.

Respectfully Submitted,

/s/ Marc J. Randazza
Marc J. Randazza, BBO# 651477
mjr@randazza.com, ecf@randazza.com
Jay M. Wolman, BBO# 666053
jmw@randazza.com
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (978) 801-1776
*Attorneys for Plaintiffs*

**ADD014**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 10, 2023, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ Marc J. Randazza
Marc J. Randazza

**ADD015**